UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

              - against -                       **MEMORANDUM & ORDER**

MARVIN PIPPINS,                        19-CR-378 (PKC)

                    Defendant.

------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Defendant Marvin Pippins, a.k.a. Mukk ("Defendant"), was indicted on February 14, 2020, along with eight co-defendants, as part of a sweeping indictment involving members of the 5-9 Brims, a criminal enterprise affiliated with the Bloods street gang that operates in parts of New York City, including Brooklyn.  On April 24, 2023, at the conclusion of a twelve-day trial, the jury convicted Defendant of all six counts against him in the Second Superseding Indictment ("S-2 Indictment"), including murder-in-aid-of-racketeering.  Defendant now moves pursuant to Rule 29 of the Federal Rules of Criminal Procedure to vacate the guilty verdicts on all counts, and pursuant to Rule 33 for a new trial.  (Def. Mot. to Set Aside Verdict, Dkt. 488; Def. Second Mot. for a New Trial, Dkt. 550.)  For the reasons set forth below, Defendant's motions are denied.

## BACKGROUND

### I.    The Charges

      On September 24, 2020, Defendant was charged in the S-2 Indictment with various crimes relating to his participation in the affairs of the 5-9 Brims, including conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracies to possess and distribute drugs and to kill members of rival gang Real Ryte, and illegal firearms possession and use.  Most central to Defendant's trial was the murder-in-aid-of-racketeering charge against

Defendant for the killing of rival gang member Sean Peart ("Peart"), a.k.a. S. Dot, on December 19, 2015.  Specifically, Defendant was tried on charges of: (1) racketeering conspiracy in violation of 18 U.S.C. § 1962(d) ("Count One" or "the RICO conspiracy"); (2) conspiracy to commit murder in-aid-of-racketeering in violation of 18 U.S.C. § 1959(a)(5) ("Count Two"); (3) murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) ("Count Three" or "murder-in-aid-of-racketeering" or "the [Violent Crimes in Aid of Racketeering Activity ("VICAR")] count"); (4) unlawful use of firearms resulting in death in violation of 18 U.S.C. § 924(j)(1) ("Count Four"); (5) conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii), 841 (b)(1)(C), and 841(b)(1)(D) ("Count Six"); and (6) unlawful use of a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Seven").  (S-2 Indictment, Dkt. 137.) Count Seven also charged Defendant with aiding and abetting or willfully causing the drug trafficking crime charged in Count Six under 18 U.S.C. § 2.  (*Id.*)

### A.    The Trial

Construed in the light most favorable to the government, *see United States v. White,* 7 F.4th 90, 98 (2d Cir. 2021), the government's proof at trial—which included 15 witnesses and a host of documentary, audio, photographic, and video evidence—established the following:

Defendant belonged to the 5-9 Brims, having been inducted into the enterprise around 2010 (Trial Transcript ("Trial Tr.") 389, 393), and participated in a conspiracy to commit various crimes until at least February 2020, when he was indicted in this case.  Critically, the evidence at trial established that Defendant killed Sean Peart by shooting him multiple times outside the Weeksville housing complex in Brooklyn.  (GX 851 (photo array); Trial Tr. 53–55 (eyewitness testimony); GX 317 (compilation of video evidence of the shooting); GX 750

2

(autopsy report prepared by forensic pathologist Christopher Borck).)

### B.     Testimony of Marcus Laborde

The government presented the testimony of Marcus Laborde ("Laborde"), a.k.a. Chi Town, a former 5-9 Brims member and leader, as the main witness against Defendant.  Laborde, who had entered into a cooperation agreement with the government, provided background on the rules, customs, purposes, and criminal activities of the 5-9 Brims, an "independent set" of the Bloods. (Trial Tr. 319–21, 359.)  The 5-9 Brims also go by names "Prime Time" and "Hat Boys" and operate as part of the New York Blood Brim Army, or NYBBA.  (*Id*. 320–21.)  Other sets falling under the NYBBA umbrella are the Blood Hound Brims and the Mac Baller Brims, but among the Bloods sets, the 5-9 Brims are considered "elite."  (*Id*. 322, 330.)  When asked if he was part of any "particular regime" of the 5-9 Brims, Laborde responded that he belonged to the neighborhood gang called the "Breadgang," which operated in the Marlboro Houses in Brooklyn.  (*Id*. 323.) According to Laborde, if someone is part of the Breadgang, he is either associated with, or a member of, the 5-9 Brims.  (*Id*. 323–24.)

Laborde testified that he held the title of "Godfather"—the highest position in the hierarchy—of the Brooklyn 5-9 Brims from approximately 2008 to 2014.  (*Id*. 322–23, 340.) Laborde "jumped into the high one," to achieve the position of "Godfather" or "GF," when the then-Godfather was caught stealing from the "kitty," or the pot of money to which gang members contributed for the benefit of incarcerated 5-9 Brims members.  (*Id*. 340–41.)  When Laborde first became a Brim, he acted as a secretary for Ronald Howard, a.k.a. Lacey, who was the "biggest Brim . . . at the time."  (*Id*. 332–33.)  As part of his role as secretary, Laborde had the power to initiate other people.  (*Id*. 333.)  Laborde initiated Defendant into the 5-9 Brims around 2010 or

3

2011 after Defendant "persistent[ly]" asked to be initiated. (*Id.* 389, 393.) Defendant came to be known as a "shooter" for the 5-9 Brims because he was "violent" and "aggressive." (*Id.* 400.) Laborde identified Defendant in the courtroom as a member of the 5-9 Brims and Breadgang. (*Id.* 325.)

Laborde testified to the identities of several 5-9 Brims associates or members through the government's photographic evidence. (*See, e.g.*, GX 1210A, GX 1114A, GX 1403A, GX 1307A, GX 1505, GX 1509, GX 1511A, GX 1319A; *see also* Trial Tr. 458–83.) These individuals included James Sease, a.k.a. Chop Wop; Montel Shuemake, a.k.a. Buzzo; Rodolfo Zambrano, a.k.a. Latinn Dinero; Jeffrey Bush, a.k.a. Chuck or Chuck Taylor; Brian Jackson, a.k.a. Maxx Millii; Melvin Pippins, a.k.a. Melly; and Defendant, a.k.a. Mukk.

Laborde testified that after the murder of Melvin Pippins (hereinafter "Melly")— Defendant's twin brother—in Brooklyn in October 2015, Real Ryte, a neighborhood gang that operates out of Canarsie, Brooklyn, became the 5-9 Brims' main rival. (Trial Tr. 83, 324–25, 503.) According to Laborde, Melly was known primarily as a member of the Breadgang and had a reputation as a scammer (i.e., someone who engages in the unauthorized use of credit cards to make large purchases), but not as someone who committed any other types of crimes. (*Id.* 404– 05, 415.) The 5-9 Brims honored Melly after his death with posts on social media, clothing with his image on it, and candlelight vigils. (*Id.* 513–14; *see also* GX 1104, GX 1203.)

Laborde first became aware of Melly's murder when he was incarcerated. (Trial Tr. 509– 10.) He called 5-9 Brims member Jeffrey Bush, a.k.a. Chuck or Chuck Taylor, to get more details of the crime, and on a phone call, Chuck told Laborde that he believed Real Ryte was responsible for Melly's death. (*Id.* 510.) This made Real Ryte members "Brim most wanted." (*Id.* 512.)

Because of Melly's death, the expectation in the 5-9 Brims was "[m]urder for murder" (*id.* 519), and that Real Ryte members were "on site" for 5-9 Brims after Melly's murder, meaning that "when you lay eyes" on them, you "do something to them on site" (*id.* 744).

Believing Real Ryte to be responsible for Melly's death, Defendant killed Peart, a Real Ryte member.  (*Id.* 325, 503, 520–21.)  Laborde, who was still in prison at the time of Peart's killing, learned about this through other 5-9 Brims members.  (*Id.* 510, 512.)  After being released from prison, Laborde learned further details about Peart's murder from Chuck and another co-conspirator, Montel Shuemake, a.k.a. Buzzo.  Specifically, Laborde learned that Defendant was responsible for Peart's (a.k.a. S. Dot) murder.  (*Id.* 521.)  Subsequently, Defendant seemingly confirmed this fact by making a reference in Laborde's presence to "smoking a dotty pack," which Laborde took to be a disrespectful way to refer to someone who is deceased by insinuating that you have named a strain of weed after that person and are smoking it.  (*Id.* 521–22.)  After Peart's murder, Defendant's reputation in the gang changed because some 5-9 Brims members "glorified" Defendant based on the violence, and some "feared him."  (*Id.* 535.)

When asked if it mattered who in Real Ryte was killed in retaliation for Melly's death, Laborde said no, indicating that the two organizations were dedicated to waging violence against each other at the time relevant to the charged conspiracy.  (*Id.* 520.)  Even after Defendant killed Peart, the rivalry between the 5-9 Brims and Real Ryte persisted.  (*Id.* 536–39.)

Laborde testified that he knew Defendant had engaged in the following criminal activity as part of his membership in the 5-9 Brims: selling crack cocaine (*id.* 343, 401); possessing a gun (*id.* 348); dealing drugs with a gun (*id.* 395–96); firing a gun, including at Laborde himself (*id.*

397); scamming, i.e., unauthorized use of credit cards to make large purchases (*id.* 404–05); and killing Peart (*id.* 408).[1]

## C.   Testimony of Khalif Watson

The government's other central witness against Defendant was Khalif Watson ("Watson"), another cooperating witness, who was a member of various sets of the NYBBA, including the East Homicide Brims, the Blood Hound Brims, and eventually the 5-9 Brims.  (Trial Tr. 923–24, 1028.) Watson corroborated Laborde's testimony that the 5-9 Brims were the "highest set of all Brims." (*Id.* at 923.)  Watson testified that one of the nine rules of the 5-9 Brims was "fear no foe," meaning that if you saw a rival gang member, you would "deal with them with violence." (*Id.* 929.)  Watson further testified that one such rival to the 5-9 Brims was Real Ryte, a gang known for scamming. (*Id.* 932–33.)  Real Ryte's leader was Dajahn McBean, a.k.a. Jeezy Muula.  (*Id.*)

Watson provided context regarding the degree to which individuals can be affiliated with multiple gangs at the same time or change allegiances over time.  For example, if one was in a neighborhood gang affiliated with a national gang like the Bloods or Crips, one could still commit crimes with the overarching gang.  (*Id.* 934.)  Further, there were Real Ryte members who were once 5-9 Brims members, including Jeezy Muula.  (*Id.* 936.)  Despite never being a Real Ryte member, Watson committed scamming activity with members of Real Ryte, including "Telly" and

---

[1] To the extent that Defendant cursorily argues as placeholders at the end of his motion that the evidence was insufficient to find him guilty of the RICO conspiracy charged in Count One or the drug-related offenses charged in Counts Six and Seven (Br. Supp. Mot. to Set Aside Verdict, Dkt. 488-1, at 45–46), the Court finds that there was sufficient evidence for the jury to find Defendant guilty on these counts.

"Bucko," and also engaged in violent crimes with them, some directed at the 5-9 Brims. (*Id.* 945, 948.)

Watson testified that around 2016, Real Ryte's rivals were the Breadgang[2] and Folk Nation. (Trial Tr. 949.) He echoed Laborde's testimony in explaining that the Breadgang was "a group of 5-9 guys from the Marlboro Houses projects," and told the jury that Laborde had explained to him that members of the Breadgang "were [Laborde's] little mans and that they were all under [Laborde]." (*Id*. 949, 975.) Being "under him" meant that they were "all under [Laborde] in 5-9." (*Id.* 975.) On cross-examination, Watson confirmed that every member of the Breadgang whom he met was also a 5-9 Brims member. (*Id.* 1034.) He identified Defendant as someone he knew in the 5-9 Brims. (*Id.* 953.) Before Watson met Defendant, he understood that the reason Real Ryte considered the Breadgang a rival was Peart's killing. (*Id.* 952–53.) Watson even recounted being with Telly and another Real Ryte member one night when Jeezy Muula called them and told them that he had "the drop," or physical location, for several Breadgang members— including Defendant. (*Id.* 951.) Jeezy Muula told Watson and his companions to go shoot at Breadgang members to avenge the killing of S. Dot. (*Id.* 962–64.) Watson and his friends complied with Jeezy Muula's instructions and drove into Manhattan to find and shoot at Breadgang members. (*Id.*)

After Watson's release from a drug treatment facility in August 2017, he began robbing cellphone stores to make money. (*Id.* 976–77.) Watson invited Laborde to join his robbery

---

[2] Defendant argues that the fact that Watson identified the Breadgang, as opposed to the 5-9 Brims, as a rival of Real Ryte demonstrates the distinction between the Breadgang and the 5-9 Brims. (Br. Supp. Mot. to Set Aside Verdict, Dkt. 488-1, at 27.) This is belied by Watson's very next statement about the Breadgang being composed of "5-9 guys." (Trial Tr. 949.)

schemes because he had met Laborde in this facility and because Laborde was a "big [H]at," meaning Laborde had superior status in the 5-9 Brims.  (*Id.* 974, 978.)  For one of the two robberies they committed together, Laborde brought Defendant and another Breadgang member with him.  (*Id.* 989.)  Watson had an "uneasy feeling" about this because of his association with Real Ryte and the fact that Watson had previously shot at members of the Breadgang, including Defendant.  (*Id.* 996–97.)  For this reason, Watson took various measures—including offering to share the proceeds of the robbery with Defendant and the other Breadgang member—to ingratiate himself with Defendant.  (*Id.* 1001.)  At one point, when Watson was alone with Defendant, Watson told Defendant that Melly was Watson's "son" and a "cool dude."  (*Id.* 1005.)  In response, Defendant said, "they took my [Defendant's] baby boy," and that Defendant "did boy dirty for that," while making a gun gesture with his hand.  (*Id.* 1005–06.)  Watson understood the "they" to refer to Real Ryte.  (*Id.* 1006.)[3]

### D.    Defense Case[4]

At the close of the government's case, Defendant presented the jury with a defense case, including taking the stand to testify in his own defense.  Among other admissions, Defendant testified that he murdered Peart outside of the Weeksville housing project by firing a gun at him

---

[3] Because Defendant's Rule 29 and 33 motions focus on the sufficiency of the evidence establishing Defendant's gang-related motive and on the Court's jury instruction on that element, the Court does not describe the other evidence offered by the government to prove Defendant's identity as Peart's killer, which included an eyewitness to the shooting, surveillance video of the shooting, and a rap song posted on SoundCloud of Defendant boasting about the Peart murder.

[4] The Court provides information on the defense case for background and context only and does not rely on any of the defense case in the Court's Rule 29 analysis, for the reasons explained, *infra*, at 14 n.7.

six times.  (Trial Tr. 1665–66.)  Defendant testified that he killed Peart because he believed Peart was involved in Melly's murder and because he feared Peart was eventually going to kill him.  (*Id.* 1674.)  Defendant testified that, before the killing, Peart was "on sight" with Defendant, meaning that if the Defendant were to see Peart, he would kill him on the spot.  (*Id.* 1680.)  Also, when asked whether "[t]he Real Rytes deserved what Melly got?," Defendant answered "[t]hat's how I felt, yes."  (*Id.* 1680.)

Defendant also offered the testimony of Edward McCarthy, an individual whose family hosted Defendant for a number of years at their home in Fairfield, Connecticut, through a Fresh Air Fund program, starting when Defendant was a young child.  (*Id.* 1725, 1727.)  McCarthy testified that Defendant told McCarthy stories about Defendant's twin "Melly" and that McCarthy learned from these stories that the two brothers were close and that Defendant viewed Melly "like an idol."  (*Id.* 1735–36.)

## II.    The Verdict and Post-Trial Motions

At the close of the government's case, Defendant moved for a judgment of acquittal as a "placeholder" under Rule 29.  (Trial Tr. 1412.)  The Court deferred ruling on the oral motion.  (*Id.* 1414.)  On April 24, 2023, the jury returned a guilty verdict against Defendant on all counts charged against him in the S-2 Indictment.  Defendant subsequently filed motions seeking relief under Rule 29 and Rule 33 as to all counts of conviction.  (*See* Def. Mot. to Set Aside Verdict, Dkt. 488; Def. Second Mot. for a New Trial, Dkt. 550.)

## III.    The Second Post Trial Motion

On May 17, 2023, Defendant filed his first motion for a new trial as part of his motion to vacate his sentence.  (Def. Mot. to Set Aside Verdict, Dkt. 488.)  After this motion was fully

briefed, the government filed a letter on July 6, 2023 disclosing that it had come into possession of "recorded jail calls and e-mail correspondence—that may contain material discoverable pursuant to Title 18, United States Code, Section 3500 and/or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972)" and that it had provided this material to Defendant. (Gov't Ltr., Dkt. 508.)  Approximately a week later, counsel for Defendant submitted a letter to the Court explaining that the government had belatedly disclosed 694 jail calls totaling 5,570 minutes of audio and 6,253 pages of emails,[5] and requesting that the Court lift the "sensitive" designation on this material to enable more efficient review of these calls.  (*See* Dkt. 512.)  The parties came to an agreement regarding the designation without the Court's intervention.  (*See* 7/26/2023 Dkt. Order.)

Then, on February 2, 2024, Defendant filed a second motion for a new trial, arguing that by failing to disclose the telephone calls and emails, the government had violated *Brady/Giglio*, and that there was a "reasonable probability that the outcome [of the trial] would have been different" had the government timely disclosed this material.  (Def.'s Mem. in Supp. of Second Mot. for a New Trial ("Def. Second Rule 33 Br."), Dkt. 550-1, at 1.)  The government opposed the motion, arguing that the evidence was either non-impeaching or cumulative of other impeachment evidence produced before trial and that Laborde's testimony was corroborated by other evidence introduced at trial, such that pre-trial disclosure of the impeachment material would not have altered the result of the trial.  (*See generally* Gov't Resp. to Second Mot. for a New Trial

---

[5] In his second motion for a new trial, Defendant refers to the production as consisting of "nearly 600 phone calls and approximately 1,867 emails of Marcus Laborde[.]" (Def. Second Rule 33 Br., Dkt. 550-1, at 4.)

("Gov't Second Resp. Br."), Dkt. 556.)  The Court held argument on the second motion for a new trial on March 19, 2024, reserved decision, and ordered supplemental briefing relating to the materiality or potential impact of the belatedly disclosed *Giglio* material.  (3/19/24 Minute Entry.) The government filed its submission on March 29, 2024 (Gov't Supp. Br., Dkt. 562), and the defense filed their response on April 12, 2024 (Def. Supp. Br., Dkt. 565).  Defendant's Rule 29 motion and both of his Rule 33 motions are now ripe for decision.

## DISCUSSION

I.      **Defendant's Rule 29 Motion**

Given the different legal standards and scope of evidence the Court can consider with respect to Defendant's Rule 29 and Rule 33 motions, the Court evaluates them separately, starting with the Rule 29 motion.  Because Defendant only raises the *Brady/Giglio* issue in support of his Rule 33 motion, the Court does not consider the potential impact of the non-disclosure of the alleged *Giglio* material in deciding his Rule 29 motion and determining whether the evidence presented by the government at trial was sufficient to convict Defendant.   *United States v. Landesman,* 17 F.4th 298, 331 (2d Cir. 2021) (contrasting different standards for Rule 29 and Rule 33 motions); *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (explaining that it is the parties' role to frame the facts and arguments for decision).

A.      **Rule 29 Legal Standard**

Under Federal Rule of Criminal Procedure 29, "a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)).  A defendant

challenging a jury's guilty verdict "bears a heavy burden," *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017), and a Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (citation omitted). In considering such a motion, "[n]ot only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 335 F.3d at 180. "Moreover, 'the evidence must be viewed in its totality, as each fact may gain color from others.'" *Landesman*, 17 F.4th at 319 (quoting *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005)). Furthermore, "the Government need not negate every theory of innocence." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

"A 'jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Berry*, No. 20-CR-84 (AJN), 2022 WL 1515397, at *4 (S.D.N.Y. May 13, 2022) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)). "The fact that a conviction may be supported only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt*." United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). Indeed, a witness's credibility is particularly "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011).

**B.      Application**

1.      <u>Sufficiency of the Evidence For Counts One, Three & Four</u>

a.   <u>The Evidence Was Sufficient to Show that Defendant Had a Gang-Related Motive in Killing Sean Peart</u>

Defendant's Rule 29 motion first argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that Defendant was guilty of the RICO conspiracy charged in Count One, the murder-in-aid-of-racketeering charged in Count Three, and the related charge of unlawful use of firearms resulting in death in Count Four.  (Br. Supp. Mot. to Set Aside Verdict, Dkt. 488-1 (hereinafter "Dkt. 488-1"), at 20–28.)  Specifically, Defendant argues that the government's evidence was insufficient to show that he was at all motivated to murder Peart in connection with conducting the affairs of, or to maintain or increase Defendant's own position in the 5-9 Brims, as opposed to being motivated *solely* by a desire to avenge his brother Melly's death.  (*Id.*)[6] Defendant claims that "<u>no</u> evidence introduced during the Government's direct case would permit a rational juror to conclude that [Defendant] harbored an enterprise-related motive to kill Sean Peart."  (Dkt. 488-1, at 24.)  From this, Defendant argues that his RICO conspiracy and death-resulting weapons charges also must be vacated, because they are dependent on his murder conviction.   The Court rejects Defendant's argument about the insufficiency of the motive

---

[6] As discussed *infra*, Defendant also argues that the Court erroneously instructed the jury that Defendant's gang-related motive need not have been his only motive for killing Peart.  (Dkt. 488-1, at 33–41; Jury Instrs., Dkt. 479 (hereinafter "Dkt. 479"), at 59–60 ("The fifth element requires the Government to prove beyond a reasonable doubt that the Defendant's general purpose in committing the crime of violence was to gain entrance to, or maintain or increase his position in, the enterprise.  The Government is not required to prove that it was the Defendant's sole or principal motive.  You need only find that it was <u>one</u> of his purposes.").  The Court rejected that argument at trial and affirms that ruling below.

evidence and therefore finds that Defendant has not met the "heavy burden" to establish the insufficiency of the evidence on these counts.[7]

First, the very conflict that led to Peart's murder was borne of the rivalry between the 5-9 Brims and Real Ryte: after all, 5-9 Brims members believed that Melly was murdered as part of that conflict. (Trial Tr. 416 (Laborde testifying that Melly was murdered by Real Ryte members).) Therefore, it is virtually impossible to disentangle Defendant's act from its origin in gang-related feuding. *See, e.g.*, *White*, 7 F.4th at 102 ("[Defendant's] conflict with [the victim] stemmed entirely from MBG's rivalry with Killbrook."); *see also United States v. James*, 239 F.3d 120, 124 n.5 (2d Cir. 2000) ("With respect to defendant's contention that [the] murder was an act of personal revenge and was not done in aid of defendant's racketeering enterprise, we agree with the district court that 'one of the motivations for [this murder] was tied to the association with the enterprise and the desire to maintain standing, if you will, in that . . . for lack of a better way of putting it, community.' And this is sufficient, under our precedents, to support a conviction for conspiracy to commit murder in aid of racketeering."). Indeed, Laborde indicated that the 5-9 Brims' reaction to Melly's death was "[m]urder for murder" (Trial Tr. 519) and that Real Ryte members were "on site" for 5-9 Brims after Melly's murder, meaning that "when you lay eyes" on them, you "do something to them on site" (*id.* 744). Furthermore, Laborde testified that Melly's death had a

---

[7] As previously noted, the Court considers only the evidence introduced during the government's case in assessing the sufficiency of the evidence because Defendant made a motion under Rule 29 at the close of the government's case, and the Court reserved its decision on the motion. (Trial Tr. 1412–14); *see also United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("Under Rule 29(b), when a district court reserves decision on a defendant's Rule 29 motion at the close of the Government's evidence, 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" (quoting Fed. R. Crim. P. 29(b)).)

"major impact" on the 5-9 Brims and that they memorialized Melly through clothing, social media posts, and vigils.  (*Id*. 513.)  Based on this evidence, the jury readily could have concluded that Defendant was acting at least in part out of gang-related motives.  *See United States v. Rubi-Gonzalez*, 311 F. App'x 483, 486 (2d Cir. 2009) (summary order) (finding sufficient evidence for a § 1959 murder conviction where the gang—MS-13—had a "fight at first sight" policy with regard to rival gangs).[8]

Second, the jury heard evidence that violent acts were part of 5-9 Brims membership and that committing such acts enhanced one's reputation within the enterprise.  Courts have found evidence indicating that violent acts enhance the status of a member of a criminal enterprise to weigh in favor of finding sufficient evidence for convictions under the VICAR statute.  *See United States v. Whitten*, 610 F.3d 168, 179–81 (2d Cir. 2010) (reversing the district court's grant of defendant's Rule 29 motion in finding sufficient evidence on the VICAR charge).  For example, Laborde said that being a "shooter"—someone who carried a gun and was known to shoot people—was a respected title within the gang.  (Trial Tr. 400–01 (Q: Why is it looked at as a badge of honor to be a shooter? A: That's street . . . regular street stuff, street code, gang code. Q: 5-9 Brims code? A: Yes.).)  Laborde went further in specifically testifying that Defendant had a reputation as a "shooter" in the 5-9 Brims (*id*. 400), and that he was "glorified" and "feared" after and because of the Peart murder (*id*. 535).

---

[8] Much of the evidence discussed in this section is based on Laborde's testimony.  As discussed in detail in Section II.B.2, a jury also could have relied on Khalif Watson's testimony, and significant documentary, audio, photographic, and video evidence to find that Defendant had the requisite motive.  *See infra* Section II.B.2.

Third, there was evidence that Defendant was proud of his action and wanted to make others aware that he had committed the murder.  For example, he boasted to Laborde that he (the Defendant) was "smoking a dotty pack," which Laborde interpreted as Defendant bragging about having killed Peart, known as "S. Dot."  (*Id*. 521–22.)  Defendant also told Watson that he "did boy dirty," while making the shape of a gun in his hand, in the aftermath of Watson invoking Melly's death.  (*Id.* 1005–06.)  Boasting to fellow gang members and associates about committing a crime supports the inference that Defendant was motivated by his membership in the 5-9 Brims when he killed Peart.  *See Whitten*, 610 F.3d at 180 (finding sufficient evidence of gang-related motive because the defendant "was proud of the crimes and wanted others to be made aware of them").

Defendant argues that because Laborde testified that no other members of the 5-9 Brims were aware of his plans to murder Peart, the murder was not gang-related.  (Trial Tr. 724.)  The government, however, was not required to prove that the shooting was "explicitly or implicitly authorized by the gang's leaders," or that Defendant had an important position in the 5-9 Brims. *White*, 7 F.4th at 102–03.  Instead, the government needed only "to adduce evidence from which the jury was entitled to conclude that a desire on [Defendant's] part to maintain or increase his status or membership in the gang was among his motives."  *Id*.  at 103.  Further, Defendant's reliance on *United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), is unavailing.  In *Thai*, the Second Circuit found insufficient evidence of the motive element of the VICAR statute where a gang leader ordered the bombing of a restaurant in exchange for the payment of $10,000.  29 F.3d at 817–18.  In reversing the district court's finding of sufficiency on the motive element, the panel concluded that the defendant had not ordered the bombing to maintain or increase his position in

the gang, but for reasons that were "purely mercenary." *Id.* at 818.  Here, by contrast, there was

no evidence of a financial or pecuniary motive, such as a promise or payment of money for killing

Peart; Defendant was not a hired gun used by the 5-9 Brims for the murder.  And although there

was evidence that Defendant murdered Peart to avenge his brother's death, there was also ample

evidence for the jury to find that Defendant, as a 5-9 Brims member or associate, was motivated

to commit the murder out a sense of vengeance for his gang "community." *James*, 239 F.3d at

124 n.5.

Finally, Defendant relies heavily on *United States v. Blondet* in arguing that his VICAR

convictions should be overturned because the evidence was insufficient to show the requisite

motive.  No. S13 16-CR-387 (JMF), 2022 WL 17370032 (S.D.N.Y. Dec. 2, 2022).  In *Blondet*,

the defendant—a member of a violent Puerto Rican drug trafficking gang called La ONU—shot a

woman at a party who refused his sexual advances, which Blondet, the "second in command" in

the San Jose faction of La ONU, found disrespectful.  2022 WL 17370032, at *3–4.  Though

acknowledging that the question was a "close one," the district court granted the defendant's

motion for acquittal on his VICAR conviction, finding, *inter alia*, that the required motive was not

established because the murder victim was not affiliated with a La ONU rival, the murder did not

advance the interests of La ONU, and the murder did not enhance the defendant's reputation after

the fact.  *Id*. at *13–14.  The facts in this case, however, are wholly distinguishable from *Blondet*.

First, the murder victim, Peart, was not an "unaffiliated" partygoer who randomly angered

Defendant, but a rival gang member whom Defendant and other 5-9 Brims members suspected of

killing Defendant's brother, Melly.  Second, Peart's murder advanced the interests of Defendant's

gang, the 5-9 Brims, because it fulfilled their "murder for murder" credo and served to solidify

their reputation as a violent street gang that took care of their own.  Third, the Peart's killing enhanced Defendant's reputation within the 5-9 Brims as a "shooter," and earned him the fear and respect of other gang members.  Thus, in contrast to *Blondet*, there was ample evidence for the jury to conclude that Defendant's motive for killing Peart was gang-related, even if it was also personal.

In light of the testimony and documentary evidence presented by the government, the Court finds that there was more than sufficient evidence from which the jury could conclude that Defendant committed the murder as part of a pattern of racketeering activity, and that at least "*one motive* for the killing was to maintain or increase position within" the 5-9 Brims.  *United States v. Laurent*, 33 F.4th 63, 84 (2d Cir. 2022) (emphasis added).  The Court therefore rejects Defendant's challenge to his convictions on Counts One, Three, and Four.

### b.  The Evidence Was Sufficient to Show that the Breadgang Was Part of the 5-9 Brims

Defendant argues in the alternative that if the Court concludes that the evidence was sufficient for the jury to find that Defendant was motivated at least in part by gang-related animus when he killed Peart, the gang he committed the murder for was the Breadgang, not the 5-9 Brims. Under this theory, Defendant posits that the government impermissibly conflated the Breadgang with the 5-9 Brims—the enterprise charged in the indictment—thereby prejudicially amending the S-2 Indictment.  (Dkt. 488-1, at 28.)

To begin, the Court agrees with the government that the factual question for the jury's consideration was not the relationship between the 5-9 Brims and the Breadgang, but simply whether Defendant was a member or associate of the 5-9 Brims, and whether, when Defendant murdered Peart and agreed with others to murder members of Real Ryte, he did so with the purpose

18

of maintaining or increasing his position in the 5-9 Brims.  (Br. Opp. Def.'s Mot. to Set Aside Verdict, Dkt. 501, at 17.)  For the reasons previously discussed, the Court finds that there was sufficient evidence at trial to prove that Defendant was a member or associate of the 5-9 Brims, and that he was motivated, at least in part, to kill Peart by a desire to maintain or increase his position in the 5-9 Brims.  (*See, e.g.*, Trial Tr. 389 (Laborde's testimony as to Defendant's membership in the 5-9 Brims); *id.* 953 (Watson's testimony as to Defendant's membership in the 5-9 Brims); GX 1307A; GX 1317A; GX 1511A.)

Defendant argues, however, that the Court must employ a much more nuanced lens when viewing the interconnectedness—or lack thereof—between the 5-9 Brims and the Breadgang. Throughout the course of the trial, Defendant repeatedly voiced concern that the government was creating a new entity—"The 5-9 Brims of Marlboro"—as a stand-in for what, in reality, was the Breadgang. (Trial Tr. 352–55.) Defendant asserts that there were times that individuals committed acts as 5-9 Brims members and other times where these individuals committed acts as Breadgang members (*id.* 353), and that the government impermissibly collapsed these distinctions.  The government responds that Laborde testified that "the 5-9 Brims from Marlboro are Breadgang and that they're one in the same" (*id.* 352; *see also id.* 323 ("Q: So if you're a 5-9 Brims o[f] Marlboro, are you also in Breadgang? A: Yes[.])), and that in any event, there was ample evidence that Defendant was a member of the 5-9 Brims and took actions in connection with his role in that enterprise.  (Br. Opp. Def.'s Mot. to Set Aside Verdict, Dkt. 501, at 17.)  The Court agrees that there was sufficient evidence for the jury to find that the Breadgang was a subset of the 5-9 Brims, and that in any event, Defendant committed his crimes on behalf of the 5-9 Brims.

The Court rejects Defendant's strained effort to create a division between the Breadgang and the 5-9 Brims.  For example, Defendant seizes upon Laborde's testimony that although Melly was part of the 5-9 Brims, he was "more respected in the Breadgang aspect of 5-9" and known mostly as a Breadgang member, to argue that the 5-9 Brims and Breadgang were two distinct and separate enterprises.  (Trial Tr. 410.)  This is belied by the evidence introduced at trial.  The jury was entitled to credit the other parts of Laborde's testimony, as well as Watson's testimony, establishing that the Breadgang was merely a set of the 5-9 Brims, comprised of "a group of 5-9 guys from the Marlboro Houses projects."  (*Id*. 323, 356 (Laborde testifying, *inter alia*, that Breadgang was a "neighborhood gang from the Marlboro Houses" who were "5-9 members"); *id.* 949–50 (Watson testifying that "Bread Gang is a group of 5-9 guys from the Marlboro Houses projects" who were "members" and a "subset" of 5-9 Brims).)  Thus, the evidence was sufficient for the jury to find that the Breadgang was part of the 5-9 Brims and that conduct Defendant engaged in as a Breadgang member was also undertaken as a 5-9 Brims member,[9] and to the extent he engaged in conduct to maintain or increase his position in the Breadgang, the jury reasonably could have found that he did so to maintain and increase his position in the 5-9 Brims as well.  *See United States v. Farmer*, 583 F.3d 131, 143 (2d Cir. 2009) (affirming VICAR conviction where defendant could have been found to have taken action for a particular set of the Bloods, which was the enterprise charged in the indictment, given that there was testimony that "actions on behalf of a set could lead to increased status . . . within the larger Bloods enterprise"); (*see also* Trial Tr.

---

[9] As discussed *infra*, however, the jury did not need to find that the Breadgang was part of the 5-9 Brims to find that Defendant was either a member or associate of the 5-9 Brims and was motivated by a desire to maintain or increase his position in the 5-9 Brims when he took actions in his capacity as a Breadgang member.

535 (Laborde testifying that after Peart's murder, Defendant's reputation in the 5-9 Brims changed because members "glorified" Defendant based on the violence, and some "feared" him).)

* * *

Accordingly, the Court finds that the evidence was sufficient to convict Defendant of Counts One, Three, and Four.

###    2.    Sufficiency of the Evidence For Count Two

Defendant briefly argues that there was insufficient evidence to convict him of Count Two, the conspiracy to murder rival members of Real Ryte.  Defendant's argument is an amalgamation of his previous arguments, asserting that nothing but vague testimony from Laborde and social media messages established a rivalry between the 5-9 Brims and Real Ryte.  (*See* Dkt. 488-1, at 31–33.)  However, the testimony of two cooperating witnesses as to the rivalry between the 5-9 Brims and Real Ryte and a host of electronic data showing a rivalry is exactly the type of evidence that would be sufficient to sustain Defendant's conviction on Count Two.  (*See* Trial Tr. 324 (Laborde testifying to the rivalry); *id.* 949 (Watson testifying to the rivalry); GX 1512 (Facebook messages of Maxx Millii monitoring the incarceration status of Jeezy Muula, a leader of Real Ryte).)  After all, a conviction may be supported by "the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt."  *See United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (citations omitted).

Accordingly, the Court finds that the evidence was sufficient to convict Defendant of Count Two.[10]

* * *

Defendant's Rule 29 motion is denied in its entirety.

## II.      Defendant's First and Second Rule 33 Motions

### A.      Rule 33 Legal Standard

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Estevez*, 961 F.3d 519, 526 (2d Cir. 2020) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)). "A defendant who requested an instruction the court declined to give 'bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole

---

[10] As previously discussed, Defendant perfunctorily argues at the end of his motion that the evidence was insufficient to convict him of Count One and the drug-related offenses charged in Counts Six and Seven. (Dkt. 488-1, at 45–46.) However, based on the same evidence summarized above, as well as other evidence (*see, e.g.*, GX 112 (cocaine found in a pair of shorts belonging to Defendant's co-conspirator Chuck); GX 168 (scale used for measuring drugs found in the home of Defendant's co-conspirator Buzzo); Trial Tr. 401 (Laborde explaining that he and Defendant sold crack cocaine together)), the Court finds that there was sufficient evidence for the jury to find Defendant guilty on these counts.

the charge actually given, he was prejudiced.'" *Id.* at 526–27 (quoting *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011)).

**B.    Application**

1.    <u>Defendant's First Motion for a New Trial</u>

Defendant moves under Rule 33 for a new trial on all counts, arguing that the Court erred in failing to provide the jury with two of his proposed jury instructions.  One instruction related to the "motive" element of Count Three, noted *supra*, and the other proposed instruction was an attempt to distinguish between the 5-9 Brims and Breadgang.  (Dkt. 488-1, at 33–45.)  The Court finds that Defendant has failed to meet his burden to show that the Court erred in not giving either instruction.  As a result, Defendant has also failed to show that he was prejudiced by the absence of these jury instructions.[11]

a.    <u>The Motive Jury Instruction</u>

The Court provided the jury with the following instruction regarding the fifth element of the murder-in-aid-of-racketeering charge—the motive element:

> The fifth element requires the Government to prove beyond a reasonable doubt that the Defendant's general purpose in committing the crime of violence was to gain entrance to, or maintain or increase his position in, the enterprise.  The Government is not required to prove that it was the Defendant's sole or principal motive.  You need only find that it was <u>one</u> of his purposes.
>
> In determining whether a defendant's purpose in committing the crime of violence was to maintain or increase his position in the enterprise, you should give

_____

[11] The defense suggests that trial judges are reluctant to overturn a jury verdict or grant a new trial. (Def. Supp. Br., Dkt. 565, at 3.)  Such reluctance, however, is not a personal predilection on the part of trial judges; it is the standard they are duty-bound to follow.  *See Ferguson*, 246 F.3d at 134 (explaining that while a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" (quoting *Sanchez*, 969 F.2d at 1414)).

the words "maintain" and "increase" their ordinary meanings.  You should consider all of the facts and circumstances in making that determination.  In deciding what the Defendant's "purpose" was in committing a particular act, you must determine what he had in mind.  Since one cannot look into a person's mind, you should consider all of the facts and circumstances before you in making that determination. For example, you may consider what, if any, association with, or position in, the enterprise the Defendant had at the time the alleged murder was committed, and the extent, if at all, the commission of the alleged crime served to help the Defendant gain entrance to, or maintain, uphold or enhance his position within, the enterprise. If the Defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance his position or prestige within the enterprise, or if he committed it because he thought it was necessary or advantageous to maintain the position he already held, this element would be established.  These are merely examples of purposes that satisfy this element, and they are not meant to be exhaustive.

This element is therefore established if the Defendant had a personal motive for committing the act of violence so long as he was also motivated by a desire to gain entrance to, or maintain or increase his position in, the racketeering enterprise. If, however, you find that the Defendant was not motivated at all by the desire to gain entrance to, or maintain or increase his position in, the enterprise, but was motivated only by other factors, then you cannot find him guilty of this count.

(Jury Instrs., Dkt. 479 (hereinafter "Dkt. 479"), at 59–60; *see also* Trial Tr. 2125–26.)

This instruction differed from the instruction proposed by Defendant, which asked the

Court to specify the following:

[T]he enterprise-related purpose in committing the act *must be more than merely incidental*, and must be within the defendant's general purpose, or, in the alternative, the violence committed or contemplated *must be in some way integral to the defendant's membership in the enterprise*.  Maintaining or increasing the defendant's position in the racketeering enterprise *must be an animating purpose* behind the violent act.

(Def.'s Proposed Jury Instrs., Dkt. 473, at ECF 1 (emphasis added).)[12]  After extensive discussion

with the parties regarding this instruction (Trial Tr. 1817–26), the Court concluded that

---

[12] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Defendant's proposed instruction did not reflect controlling Second Circuit guidance relating to this element.  Defendant relied on *Blondet*, the decision previously discussed with respect to Defendant's Rule 29 motion.  (*See* Def.'s Proposed Jury Instrs., Dkt. 473, at ECF 2–3.)  As discussed, in *Blondet*, the district court found post-trial that the evidence was insufficient to show that a gang leader who had killed a woman after she rebuffed his sexual advances did so in furtherance of his gang membership.  2022 WL 17370032, at *13.  In charging the jury, the court had instructed the jury that it must find the defendant's desire to gain entrance to, maintain, or increase his position in the enterprise was a "substantial motivating factor" in committing the act of violence.  *See* Tr. of Jury Charge, at 2235, *Blondet*, No. S13 16-CR-387 (JMF) (S.D.N.Y. Apr. 21, 2022), ECF No. 735.  During the charge conference, Defendant also relied on *United States v. Arrington*, in which the Second Circuit noted that it was tasked with assessing whether there was sufficient "evidence from which a reasonable jury could conclude that Arrington committed [the murder] in furtherance of, or as an integral aspect of, his role as an enforcer" for his gang.  941 F.3d 24, 38 (2d Cir. 2019).  The Court finds *Arrington* unconvincing because the jury instructions used by the trial court in that case did not actually include the "integral aspect" language, but used the "general purpose" language employed by this Court, and the Second Circuit raised no issue with the instruction as given by the trial court nor did it otherwise suggest that it was erroneous.  *See* Tr. of Jury Charge, at 1161–62, *United States v. Arrington*, No. 15-CR-33 (W.D.N.Y. Sept. 25, 2017), ECF No. 338.

In declining to give Defendant's proposed instruction, the Court explained that it was not bound by *Blondet* and did not find that the "substantial motivating factor" standard was required under Second Circuit law.  (Trial Tr. 1396, 1820.)  The Court instead relied on the Second Circuit's

reasoning in *United States v. White*, 7 F.4th 90 (2d Cir. 2021).  In *White,* the panel explicitly contemplated a scenario where the defendant had a personal motive in committing an act of violence in violation of § 1959, noting that such personal motive "does not preclude his conviction under [the statute] as long as he *likewise* was motivated by a desire to increase or maintain his position in the RICO enterprise." *Id*. at 101–02 (emphasis added) (citing *United States v. Santiago-Ortiz*, 797 F. App'x 34, 36–37 (2d Cir. 2019) (summary order)).  As noted in *White*, the Circuit has "construed 'the maintaining or increasing position language in § 1959 . . . liberally.'" *Id*. (quoting *United States v. Bruno*, 383 F.3d 65, 83 (2d Cir. 2004)).

Defendant now argues that the Court's instruction runs contrary to the Second Circuit's tacit approval of the "substantial motivating factor" language used in the jury instructions—proposed by the government—in *Santiago-Ortiz*.  (Def.'s Reply, Dkt. 506, at 8–10.)  As it did during trial, the Court again acknowledges that other district courts have used the "substantial motivating factor" language when instructing juries as to this element.  Indeed, the district court in *White* instructed the jury using this language.  However, courts in this circuit *also* employ instructions similar to and consistent with the instruction the Court gave here.  *See* Final Jury Instrs., at 40–41, *United States v. Acevedo*, No. 21-CR-162 (DG) (E.D.N.Y. May 8, 2023), ECF No. 75 ("If you find that the Defendant acted for more than one purpose, but one of those purposes was to maintain or increase his position in the enterprise, then you should find this element satisfied."); Final Jury Instrs., at 78–79, *United States v. Ashburn*, No. 11-CR-303 (NGG) (E.D.N.Y. Mar. 11, 2015), ECF No. 425 ("You need only find that it was one of his purposes."); Trial Tr. 2708–09, *United States v. Christian*, No. 11-CR-425 (ENV) (E.D.N.Y. Oct. 23, 2014), ECF No. 411 (same); Jury Instrs., at 149–50, *United States v. Rivera*, No. 13-CR-149 (KAM)

(E.D.N.Y. June 15, 2015), ECF No. 453 (instructing the jury on this element without employing the "substantial motivating factor" language). The Court, in the absence of controlling authority to the contrary, chose to use the formulation it did—which has also been tacitly approved by the Second Circuit[13]—because it found that this language more accurately reflected the prevailing standard. (Trial Tr. 1819–26); *see also United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) ("[I]n order to establish a direct violation of § 1959 [] the government was required to prove beyond a reasonable doubt . . . [defendant's] general purpose in so doing was to maintain or increase his position in the enterprise.").

The Court therefore finds that Defendant has failed to demonstrate that the Court erred by declining to give Defendant's proposed motive instruction.

### b.  The Charged Enterprise Jury Instruction

Defendant next argues that the Court committed error by denying Defendant's proposed instruction that purported to de-conflate the Breadgang from the 5-9 Brims. Defendant proposed the following instruction:

> Several counts of the indictment charge Mr. Pippins with committing certain crimes as part of his participation in the charged enterprise, which the Indictment identifies as the 5-9 Brims. I have instructed you regarding each of these charges and their elements. I want to make clear however, that because the charged enterprise is the 5-9 Brims[,] you may not convict Mr. Pippins for any conduct you find he committed on behalf of another group of which you have heard testimony—the Bread Gang—*unless you find beyond a reasonable doubt that the Bread Gang is part of the 5-9 Brims*.
>
> In determining whether the Bread Gang is part of the 5-9 Brims you should consider all the relevant testimony including, e.g., any testimony that Bread Gang in fact was part of the 5-9 Brims; whether Bread Gang members were required to

---

[13] *See, e.g.*, *Laurent*, 33 F.4th at 83 (affirming VICAR conviction from *United States v. Ashburn*); *United States v. Booker*, 825 F. App'x 4, 13 (2d Cir. 2020) (summary order) (affirming VICAR conviction from *United States v. Christian*).

be members of the 5-9 Brims; whether Bread Gang members were required to follow the rules of the 5-9 Brims; and any other evidence that the Bread Gang operated within or outside the hierarchy of the 5-9 Brims. If you find beyond a reasonable doubt that the Bread Gang operated within the hierarchy of the 5-9 Brims you may consider conduct, if any, that you find Mr. Pippins undertook because of his position the Bread Gang to be conduct he undertook because of his position in the 5-9 Brims.  But if you do not make such a finding beyond a reasonable doubt then you may not find that because Mr. Pippins undertook certain conduct because of his position in the Bread Gang that he undertook such conduct because of his position in the 5-9 Brims.

(Def.'s Proposed Jury Instrs., Dkt. 473, at ECF 3–4 (emphasis added).)[14]

"A conviction will not be overturned for refusal to give a requested charge . . . unless that [requested] instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023) (citing *United States v. Holland*, 381 F.3d 80, 84 (2d Cir. 2004)).  Here, Defendant's proposed Breadgang instruction, at a minimum, misstated the legal requirement, in that it instructed the jury that they *could not* convict Defendant if they found he had committed acts for the purpose of gaining entrance to and maintaining and increasing position in the Breadgang, unless they also found that the Breadgang was part of the 5-9 Brims.  But Defendant did not even need to be a member of the 5-9 Brims to be convicted of any of the VICAR crimes, nor would his motivation to maintain or increase position in the Breadgang necessarily preclude him from being similarly motivated with respect to the 5-9 Brims.  Rather, Defendant could have been convicted as an "associate" of the 5-9 Brims, as long as his actions

---

[14] Defendant argues in his reply papers that this instruction was "amended" during the charge conference with language proffered by defense counsel that "addressed the Court's concern" regarding potential jury confusion as to their required findings.  (Def.'s Reply, Dkt. 506, at 12.)  Defense counsel's "amendment," however, sought to add an extemporaneous smattering of qualifying language that the Court found would only have further muddled the issues, thus highlighting even more strongly the potential for misleading the jury.  (Trial Tr. 1410.)

were undertaken "for the purpose of gaining entrance to [or] maintaining [or] increasing position in the 5-9 Brims" (S-2 Indictment, Dkt. 137 ¶ 15), even if those actions were *also* motivated by a desire to maintain or increase position in the Breadgang.  Thus, proof that the Breadgang was part of the 5-9 Brims, while a potentially relevant fact to the jury in determining whether the requisite gang-related motive was proved, was not a necessary finding, as Defendant's proposal would have instructed.

Defendant's proposed Breadgang instruction also would have improperly heightened the government's burden of proof and constrained various avenues for the jury to find Defendant guilty.  As the Court explained in rejecting Defendant's proposal during trial, the proposed instruction would have impermissibly heightened the government's burden of proof by suggesting that the jury needed to find "beyond a reasonable doubt" that the "Bread Gang is part of the 5-9 Brims."  (*See* Trial Tr. 1402.)  Stated more plainly, the proposed instruction would have led the jury to believe that they were foreclosed from (1) finding Defendant guilty if he *also* committed crimes on behalf of both the 5-9 Brims and the Breadgang; or (2) finding Defendant guilty even if he was not a *member* of the 5-9 Brims, but an associate.  Since both of those avenues would have been legitimate ways to find that Defendant had the requisite affiliation with the charged enterprise, the proposed instruction would have been misleading, if not erroneous.  (Dkt. 479, at 58 ("[T]he Government must prove beyond a reasonable doubt [] that the Defendant was, at the relevant time, a knowing member or associate of . . . the racketeering enterprise.").)

Additionally, the theory behind Defendant's proposed instruction was encapsulated elsewhere in the jury charge.  The Court provided a specific instruction explaining that the charged enterprise was the 5-9 Brims (Dkt. 479, at 24–26) and consistently referred to the 5-9 Brims in its

instructions, thus ameliorating any potential ambiguity on this topic. *See Kukushkin*, 61 F.4th at 332.

Defendant therefore has failed to demonstrate that the Court erred by not giving Defendant's proposed instruction drawing a distinction between the 5-9 Brims and the Breadgang.

\* \* \*

Accordingly, because the Court did not "mislead[] the jury as to the correct legal standard," *Estevez*, 961 F.3d at 526 (citation omitted), Defendant's Rule 33 motion on these grounds is denied.

### 2.     Defendant's Second Motion for a New Trial

Defendant's second Rule 33 motion is based on the government's failure to produce before trial "hundreds of telephone recordings and emails" between Laborde and others while he was imprisoned at Rikers Island.  (Def. Second Rule 33 Br., Dkt. 550-1, at 1.)  The defense argues that had this alleged *Giglio* information been disclosed before trial, "there is a reasonable probability that the outcome [of the trial] would have been different."  (*Id*.)  The government counters that the belatedly produced impeachment information is immaterial because it is all cumulative of information that the government turned over before trial and because Laborde's testimony was "independently corroborated" by other evidence introduced at trial and thus the government's case did not depend "almost entirely" on Laborde's testimony.  (Gov't Second Resp. Br., Dkt. 556, at 10 (quoting *United States v. Bin Laden*, 397 F. Supp. 2d 465, 514 (S.D.N.Y. 2005), *aff'd sub. nom., In re Terrorist Bombings of U.S. Embassies in E. Afr.,* 552 F.3d 93 (2d Cir. 2008)).)

The government represents that its failure to produce the impeaching evidence pretrial was "inadvertent[]" (Gov't Ltr., Dkt. 508) and that the evidence was only discovered by the prosecution

team after trial (3/19/24 Oral Arg. Tr., Dkt. 564, at 3).  Because there is no evidence to contradict the government's explanation, the Court finds the initial non-disclosure inadvertent.[15]

a.   The *Brady/Giglio* Framework

*Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), require the government to "disclose evidence favorable to the accused that is material to guilt." *United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008).  This includes both exculpatory and "impeaching" evidence.  *United States v. Hunter*, 32 F.4th 22, 30–31 (2d Cir. 2022).  This disclosure obligation extends only as far as information "that, 'if suppressed, would deprive the defendant of a fair trial.'"  *Rittweger*, 524 F.3d at 180 (quoting *United States v. Bagley*, 473 U.S. 667, 675 (1985)).  To establish a *Brady/Giglio* violation, then, "a defendant must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)).

Reversal of a jury conviction "for failure to turn over [*Brady/Giglio*] evidence is required if the evidence is 'material.'"  *Id.*  "[T]hat is . . . if there is a 'reasonable probability' that disclosure would have changed the outcome of the case or where the suppressed evidence 'could reasonably

---

[15] While not expressly challenging the government's explanation of inadvertent non-disclosure (Def. Supp. Br., Dkt. 565, at 1 (characterizing it as an "(at best) negligent failure to disclose")), Defendant notes that the government acknowledged at the March 19, 2024 oral argument that "a number of calls" that were belatedly produced were "also within the FBI's case files."  (*Id.* (citing 3/19/24 Oral Arg. Tr., Dkt. 564, at 3–4).)  Because there is nothing in the record identifying those calls or indicating the volume of that evidence, the Court does not find that this fact undermines the government's claim of inadvertent non-disclosure.

be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 434–35 (1995)).  Impeachment information is "only rarely" material.  *Bin Laden*, 397 F. Supp. 2d at 514 (S.D.N.Y. 2005).  Specifically, impeachment information is material only "if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (citations omitted).  When "suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," the impeachment evidence is not material.  *Id.* (citation omitted.)  Similarly, if the suppressed evidence "is merely cumulative of equally impeaching evidence introduced at trial" and "would not have materially increased the jury's likelihood of discrediting the witness, it is not material." *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)).

### b.  Defendant Has Not Demonstrated Materiality

Defendant's new trial motion is based on four categories of belatedly disclosed impeachment information: "(1) Laborde's continuing drug dealing at Rikers Island; (2) Laborde's continuing drug dealing while in federal custody; (3) calls reflecting Laborde's fear that he can't do the federal time and is considering cooperating; and (4) calls explaining the government wants cooperation against 'Mook,' *i.e.*, Mr. Pippins, including wanting testimony Laborde didn't feel he was able to give, but needs to give in order to receive a time served sentence."  (Def. Supp. Br., Dkt. 565, at 6; *see* Def. Second Rule 33 Br., Dkt. 550-1, at 5–10.)  The Court finds that the first three categories of impeachment evidence are cumulative of *Giglio* information that Defendant

received before trial and used extensively at trial to impeach Laborde.  (*Compare* Def. Second Rule 33 Br., Dkt. 550-1, at 5–6 (phone recordings in which Laborde directs others to buy and sell drugs while incarcerated on Rikers Island); *id.* at 6 (phone recording where Laborde insinuates he is going to sell drugs while incarcerated at the Metropolitan Detention Center); *id.* at 7–10 (recordings of various phone calls where Laborde indicates that he is afraid of being in federal custody and considering cooperating), *with* Trial Tr. 343, 401–04, 422, 598–01, 675 (Laborde testifying generally about his extensive drug dealing and about his desire to get out of federal custody).)  Thus, the Court does not find any of the recorded calls or emails identified by Defendant in the first three categories are material, so as to trigger any relief under *Brady* or *Giglio.  See Spinelli*, 551 F.3d at 165 (explaining that cumulative impeachment evidence is not material).

In fact, the Court finds that there is only one recorded call within the fourth category—one on April 30, 2019 between Laborde and his wife, Lana—that warrants any discussion with respect to potential materiality:[16]

> [Laborde]: I mean, I don't want to, I don't want to do no fucking, I don't want to do all that time.[17]
>
> [Lana]: Yeah.

---

[16] While some of the April 19 call falls into the third category, *i.e.*, "Laborde's fear that he can't do federal time and is considering cooperating," and is thus cumulative of other impeachment evidence that was disclosed timely, the Court includes the entire section relied on by Defendant to provide context for his materiality argument.  As part of the fourth category of impeachment evidence, Defendant also points to a February 17, 2019 call between Laborde and his wife discussing the persons of primary interest to the government, "Mook," i.e., Defendant, "Wop," i.e., James Sease, and "Chuck," i.e., Jeffrey Bush.  During the conversation, Laborde states that "they [i.e., the government] want Mook . . . They want all three of them."  (Def. Second Rule 33 Br., Dkt. 550-1, at 7–8.)

[17] The defense submission contains the exact times for each of these statements, which are omitted herein.  (*See* Def. Second Rule 33 Br., Dkt. 550-1, at 8–9.)

[Laborde]: Now it's like, they don't, I don't think they even want to go through with it.

[Lana]: Really?

[Laborde]: Yeah, that's a sense I got today, because today was one of those, today was like one of those, it was, it was court.

[Laborde]: I did go in front of the judge, but I also went with, you know what I'm saying?

[Lana]: Yeah.

[Lana]: And [b]asically, they say, like, it's not enough, . . .

[Laborde]: Yeah, they keep asking me about certain shit, and they don't . . . They think . . .

[Laborde]: Yeah, they think I think I'm gonna to say, yeah, niggas is murderers, niggas is shooting guns, but that is really not the fucking case.

[Lana]: Right.

[Laborde]: We've always, we've been the ones that have been losing. Like I don't.

[Laborde]: They asked me shit about Law and I told them about Law and how I got my name Chicago and all this other dumb shit.

[Laborde]: It's like they seem. They just seem, they just not interested in . . .Yeah.

[Laborde]: Yeah, like I don't know, maybe I don't have enough . . . and like damn, so am I doing this shit for nothing?

* * *

[Laborde]: Of course, if they were to get convictions off some real hardcore shit there'd be, you know, time served.

[Laborde]: And I said, well, so if I did have something that was worth, worth your while, right?
. . .

[Laborde]: Now I'm thinking, everything I told him, everything I know was with the God honest truth.

34

[Laborde]: I went in there, at first I started lying the first two times.

[Laborde]: And after a while I just started saying, fuck it.

[Laborde]: I don't want to go to jail.

[Laborde]: I really want to come home at the end of the day.

[Laborde]: This is gonna be the first step for me to change my life, so fuck it, I might as well just go all the way out, fuck it.

[Laborde]: So I really just started telling them everything, but . . . niggas only drug dealers.

* * *

[Laborde]: Niggas ain't really . . . Niggas ain't.

(Def. Second Rule 33 Br., Dkt. 550-1, at 8–10.)

Defendant argues that this call goes to the heart of his defense, i.e., his motive for killing Peart, because it could have been used to directly impeach Laborde's testimony about the 5-9 Brims' murder credo, i.e., "murder for murder[;] . . . you kill my dog, I kill your cat" (*id.* at 13 (quoting Laborde's testimony at Trial Tr. 519–20)), which the government used to show that Defendant was motivated at least in part to kill Peart in order to exact revenge against Real Ryte on behalf of the 5-9 Brims for Melly's murder and to thereby maintain or increase Defendant's position within the 5-9 Brims.

While the April 19 conversation—especially Laborde's statement that "they think I think I'm gonna to say, yeah, niggas is murderers, niggas is shooting guns, but that is really not the fucking case"[18]—suggests that Laborde's testimony about the 5-9 Brims espousing a "murder for

---

[18] The Court recognizes, as the government argues, that this statement is ambiguous and can be interpreted differently than the defense urges, but that ambiguity, in itself, does not make

murder" credo might not have been accurate or truthful, the April 19 call is ultimately not material because the jury could have found that the 5-9 Brims adhered to such a code based on all of the *other* evidence introduced at trial, including the testimony of Khalif Watson, the social media and cellphone evidence, weapons evidence from 5-9 Brims and Real Ryte members, Defendant's rap videos, and even Defendant's own trial testimony, as chronicled in more detail below.

First, Watson's testimony. Watson's testimony is particularly noteworthy since he testified to many of the same facts about the 5-9 Brims' self-protective and retaliatory attitude toward rival gangs and their members as Laborde did.[19]   Specifically, Watson testified that one of the 5-9 Brims' "nine rules" is "fear no foe," meaning that if there is a rivalry between the 5-9 Brims and another gang, members of the 5-9 Brims expect other members to "deal with [the other gang] . . . with violence." (Trial Tr. 929–30.) He explained at trial:

---

the statement immaterial nor resolve the question of whether the defense should now be given the opportunity to impeach Laborde with it.

[19] Defendant argues that Watson was so incredible as a witness that no juror would credit any of his testimony. (Def. Supp. Br., Dkt. 565, at 17.) However, having observed Watson testify and having reviewed the transcript of it, the Court disagrees. While Watson was extensively impeached during the defense's cross-examination of him (Trial Tr. 1023–1127), and defense counsel argued in summation that he is "probably one of the most untrustworthy people in the entire world" (*id.* 1895), Watson's testimony was substantially corroborated by other evidence, including Defendant's own testimony about having committed the murder, which Watson testified Defendant obliquely had admitted to Watson. (*Compare id.* 1645–46, *with id.* at 1005–06.) Notably, in challenging Watson's credibility in his Second Rule 33 Motion, Defendant focuses on Watson's recorded prison call with his girlfriend in which he said that someone named "Kha" was inhabiting his body and controlling what he was saying to the police. (Def. Supp. Br., Dkt. 565, at 17.) However, that avenue of impeachment was largely curtailed after Watson testified that he did not recall any such conversation. (Trial Tr. at 1115–22.) Thus, despite the defense's view of Watson's credibility and/or mental competence, the jury did not have before it this prison call in assessing Watson's credibility, and the Court does not find that Watson seemed mentally incompetent or inherently incredible when he testified at trial.

Q:  Did you ever commit crimes with or for the 5-9 Brims?

A:  Yes.

Q:  What kinds of crimes?

A:  Crimes from assaults to other inmates to smuggling to robbery.

Q:  As a member of 5-9, were you expected to commit crimes for the gang?

A:  Yes.

Q:  Why?

A:  That's a part of the life.  It's a part of the life of when you are a Hat, when you are a Blood, gang member.

Q:  And why is it part of life?

A:  It's the way it's always been for me.

Q:  In your experience, did committing crimes affect how members are viewed in the gang?

A:  Yes.

Q:  How so?

A:  If – if someone is known as a fighter, he would be the person to discipline someone.  If someone is known as a murder[er] or someone who can use guns, they'll be known as an enforcer.  Or if someone is known for money, they will be known for their getting money and their – yeah, stuff like that, they'll – whatever they do, they will be known for or receive status for stuff.

Q:  In your experience, do the Brims have rivalries?

A:  Yes.
. . .

Q:  Is there an expectation within the 5-9 Brims when it comes to dealing with rivals?

A:  Yes.

Q:  What is that expectation?

A:  Well, one of the nine rules is fear no foe.  If it's a rivalry, you have to deal with

them accordingly.  Whoever is at the hierarchy, if you are in jail or on the street, whoever gives command, if it's a rivalry, you would deal with them with violence.

Q:  You mentioned the nine rules.  What are the nine rules or what are they for?

A:  It's nine rules that they give you like the paperwork that we spoke about earlier.  It's the rules that Brims have to follow or must go by.  Yeah.

Q:  If someone is a rival of the gang, is there an expectation as to how members should behave if they come across that rival?

A:  Yes.

Q:  What is that expectation?

A:  To never show fear.  Like, fear no foe.  It goes into that rule.  So to deal with them however you feel at the moment.  If a rival enters the jail and he come inside the house that we are in, if he is a rival, he has to go right away.  He can't live with us.

(*Id.* 927–30.)  Watson also corroborated that the 5-9 Brims and Real Ryte were in a gang war related to Peart's murder:

Q:  Around that time, late 2016, did Real Ryte have any rivals?

A:  Yes.

Q:  And who was their rival?

A:  Their rivals were Bread Gang, Twirlers, Folk Nation members.
…
Q:  Do you have an understanding of any reason why Real Ryte considered Bread Gang to be a rival?

A:  Yes.

Q:  And what reason?

A:  Well, when I came home, it was explained to me from Jeezy and Telly that S. Dot was killed by a member of Bread Gang.

Q:  Who did Real Ryte believe killed S. Dot?

A:  Mukk.

(*Id*. 949–65.)

> Q:  Did Real Ryte ever target anyone from -- any of the 5-9 members from Marlboro?
>
> A:  Yes.
>
> Q:  And are you aware of any violence that occurred between those two crews?
>
> A:  Yes.

(*Id.* at 954.)   Indeed, Watson himself testified that he was personally involved in Real Ryte's efforts to target Marlboro 5-9 Brims members.  (*Id.* at 955–60.)

Second, in addition to Watson's testimony demonstrating the 5-9 Brims' murder credo and the existence of a rivalry between the 5-9 Brims and Real Ryte, Defendant's own trial testimony supports the jury's verdict as to his motive.  Defendant testified that, after Melly's death, he was seeking vengeance against every member of Real Ryte:

> Q:  And after Melly's death, you in your heart knew Sdot did it, you said?
>
> A:  That's how I felt.  That's what I believed at the time, yes.
>
> Q:  So he was your hit list?
>
> A:  I didn't have a hit list.
>
> Q:  It was on sight with him, right?
>
> A:  Yes.
>
> Q:  You wanted to kill the people who had killed your brother?
>
> A:  Correct.
>
> Q:  The Real Ryte's deserved what Melly got?
>
> A:  That's how I felt, yes.
> . . .
> Q:  So as far as Jeezy Mula and Telly, they deserved what Melly got?

A:  Excuse me, ask that question again?

Q:  Jeezy Mula and Telly deserved what Melly got?

A:  Yes.

(*Id*. 1680–81.)

Third, at trial, the government introduced evidence in the form of one of Defendant's rap video for a song called "Stickin' to It."  (*Id*. 1683–86; GX 901; GX 901T.)  Defendant testified that this song was about Real Ryte killing Melly and that Defendant was still "get[ting] chills" when he went "looking for potential threats or an enemy." (Trial Tr. 1683–84.)  He further testified about the song:

Q:  And defense counsel read in a specific lyric that you wrote, "When they was killin him, should have been killin me", right?

A:  Yes.

Q:  "They" is Real Ryte, correct?

A:  Yes.

Q:  And then on the next line that they read it said, "Shit's real while I still spin, when I get the chills", right?

A:  Yes.

Q:  What's "spinning"?

A:  Spinning is when you go looking for potential threats or an enemy.

Q:  And so you said that shit is real, right, when you spin?

A:  Yes.

Q:  You get the chills?

A:  I said I still stand when I get the chills.

(*Id*.)  Defendant also rapped about the ongoing rivalry between the 5-9 Brims and Real Ryte in

another song, titled "The Difference."  (GX 903; GX 903A; GX 903T.)  In that song, Defendant raps that "[t]here's casualties to the gang when you enforcing a war" and references his "hate [for] the floss," which refers to Real Ryte.  (GX 903; GX 903A; GX 903T.)[20]  Notably, Watson testified that Defendant told him that the events described in his music were real (*see* Trial Tr. 999–1001), thereby providing a basis for the jury to rely on the lyrics in Defendant's rap songs and his testimony about them.

Fourth, social media and cell phone evidence also demonstrates Defendant's motive for Peart's killing.  In particular, the government points to evidence from Jeffrey Bush's cell phone as establishing the gang's "violent and retaliatory nature against their enemies."  (*See* Gov't Supp. Br., Dkt. 562, at 4–8.)  Bush, a.k.a. Chuck or Chuck Taylor, was one of 5-9 Brims' leaders.  As a result, his phone contained messages and notes relating to the gang's "paperwork," meaning its history and rules.  (Trial Tr. 925.)  Among this paperwork was the 5-9 oath, which states, in part, that gang members will "Protect [Their] Brim Brothers & Sisters Each & Everyone & conquer Our Enemies One By One & Anyone Who Opposes The Army."  (GX 2036.)  Another part of the gang's paperwork, known as the "PrimeTime Registration" included a vow, which stated that if the registrant broke their vow, they "Expect Nothing Less Than [Their] Own Blood Spilled."  (*Id*.)  That person also agreed to "Sacrifice [Their] Life" for the Brims.  (*Id*.)  Other paperwork contained within a message thread between Bush and Defendant suggested that 5-9 Brims shoot their rivals:

    13. hat boy salut- if it ain't brim I shoot
    17. 32 in the clip – stay low keep firen

---

[20] "Floss" is a slang term used to refer to Canarsie, which is the home of Real Ryte.  (*See* Gov't Supp. Br., Dkt. 562, at 22 (explaining same).)

(GX 2002, at 5.)  Other evidence from Bush's phone described the gang's firearm-related violence,

Defendant's possession of a firearm, and the gang's retaliatory mindset, such as the following:

> Title: Ran em out the hood now tht don't come around/ I se Body: **Ran em out the hood now tht don't come around**/ I send Scooby make 100 off sellN loud/ **So fuckN with my Yung Boi and it's going down/50 niggaz 30 shoots shit I might spray the crowd/go to war with ur mans and never surrender**/ same man won't give yu the icq to his vender/ fuck it guess that's how the game played/ but uts been loyal since the 3rd grade/sumthin like hunter ski mask in summer/ **with 100 round drum give it up for my drummer/ pick 1 make em have to hurt son/ all I do breed shootaz I gave Mukk his first gun/ Mukk gave me my first 6**/ it ain't work at first then he told me gotta punch it into/ now a nigga hip/ got em hip to point thy don't see me thy get sick/ turn Finger to Brick/ bust Brick with the Squad/9-5 Chuck who lookN 4 job/ **got shooters on pay role niggaz better lay low**/ everybody hype now thy hear me on Radio/ Still as hood as it get/ never played tag but I always been it/ kick still match the fit / ask ur bitch who the shit..everyday nigga Litt/ Who FuckN with my Click… its the Mobb Meek type beat DC4.5 Scream were bitches at we don't want no Drama/ But if niggaz keep playing we go Breadgang 42rb by mammaaaaaa fresh up off the shelf/**I gave Dity a sawed off** and he was only 12/pocket full of money it's nuffN 4 me throw the cash/ all cuz I still strectch work like yogo class/yuknow me type put us all on/ **speed dial chuck why cuz I'm the 1 thy call on/ when war on turn it too war zone/shootin every shot til every bullet in clap gone**

(GX 2067 (as excerpted in Gov't Supp. Br., Dkt. 562, at 7).)

Other social media messages in the record specifically discuss the rivalry between the 5-9

Brims and Real Ryte, which involved violence.  For example, in a September 23, 2016 Facebook

messenger conversation between Brian Jackson, a.k.a. Maxx Millii, and Shawn Wick (below), the

two discuss 5-9 Brims' "ops" (opposition) and their planned retaliation against Real Ryte.  (GX

1512.)  During the conversation, Jackson sent Wick a photo of Dajahn McBean, a.k.a. Jeezy

Muula, the leader of Real Ryte, from the New York State Department of Corrections look-up page,

including McBean's pending release date.  (*Id.*)  Jackson then stated "[t]hat's a bullet,"

corroborating the deadly rivalry between the two gangs.

> Jackson: Ops spent threw but they got up outta here assp we was on them
>
> . . .

Wick: Niggas thought they was low

Jackson: hell yea/Shit got spotted asp
. . .
Wick: A foreign ain't spin the hood in so long . . . Fuck they thought
. . .
Jackson: 4 niggas in it

Wick: Stupid niggas

Jackson: Facts they lucky if they would of spent one more time it was a drop top

Wick: How many times they spent ?

Jackson: They only got one spin in//Lol we was on it

Wick: Boy probably bout to touch that's why they slidin

Jackson: Idk Imma check his shit

Wick: U kno niggas don't move unless he say go//Im already checkin

Jackson: Nah I think it's cause Scoobz// He on his location shit // On the gram

Wick: He buggin

Jackson: With Mukk in a video// Talking about top opps

Wick: Smfh

Jackson: Wildin// yea he seen today shit real
. . .
Wick: Yea but why bait biggas wit ya location // Thats jus dumb // He touching soon// Nigga in willard // Shit only 90 days

Jackson: Yea he buggin [sends photo of NYSDOCCS Lookup page for Dajahn McBean (Jeezy Muula/Real Ryte leader), release date of 4/5/2017]
. . .
Jackson: That's a bullet

(*Id.*) And in another conversation between Jackson and Wick on October 1, 2016, the two again

discuss targeting Real Ryte members for retaliation:

43

Wick: Shit riding to the block

Jackson: Where Yu was at

Wick: In the city

Jackson: Sends a photograph of four men with the message "Cheyck ya man out[ . ]  early bird get the worm first[.]"

(*Id.*)

Finally, weapons evidence.  Weapons evidence presented at trial corroborates the existence of a violent gang war between the 5-9 Brims and other gangs.  (*See* Defendant's rap video, "The Difference," GX 903; GX 903A; GX 903T ("There's casualties to the gang when you enforcing a war[.]").)  In addition to the drug trafficking and scamming evidence found at Marlboro 5-9 Brims' leader Jeffrey Bush's and other 5-9 Brims' members' homes, the government recovered from Bush's residence body armor (GX 110) and a firearm (GX 401; Trial Tr. 111–12).  Evidence recovered from Bush's phone also included images of 5-9 Brims members with multiple firearms. (GX 2003, GX 2003B, GX 2003C, GX 2003D, GX 2003E, GX 2029A; Trial Tr. 1306–07.) Moreover, Defendant and Watson testified that members of the 5-9 Brims and Real Ryte, respectively, had firearms.  (*See* Trial Tr. 1667 (Defendant testifying that they had "guns at Buzzo's"); *id.* 957–60 (Watson testifying that in early 2017, he and members of Real Ryte "had guns" and went to shoot at "Bread Gang guys" on the orders of Jeezy Muula).)

Based on some or all of this evidence, a reasonable jury could have concluded that Defendant had the requisite motive without relying on Laborde's testimony.  Laborde's testimony about the 5-9 Brims' "murder for murder" credo therefore was not indispensable to the government's case, and the belatedly disclosed impeachment evidence as to Laborde on this issue is not material.  *See Wong*, 78 F.3d at 79 (holding that impeachment information is only material

"if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." (citations omitted)).[21]   In reaching this conclusion, the Court recognizes and has considered the fact that the government relied heavily on Laborde's testimony during its summation in arguing that the jury should find that Defendant had the requisite motive for killing Peart.  (*See, e.g.*, Trial Tr. 1873–74, 1877–78.)  However, the fact that the government emphasized Laborde's testimony does not negate the fact that the jury was presented with enough other evidence—which the government also referenced during its closing arguments[22]—to make this finding without Laborde's testimony.[23]

---

[21] In light of this ruling, the Court does not need to decide whether the April 19 conversation is cumulative impeachment evidence, as the government argues.  Such a determination is complicated by the ambiguity of the statement and its susceptibility to opposing interpretations.

[22] (*See* Trial Tr. 1874–77 (citing Watson's testimony); *id.* 1876 (citing cell phone evidence); *id.* 1877–78 (citing Defendant's own testimony).)

[23] Throughout their briefing and argument of Defendant's second Rule 33 motion, defense counsel "expressed [their] concern that once a conviction is secured, there exists powerful institutional pressures to protect it."  (*See, e.g.*, Def. Supp. Br., Dkt. 565, at 3 (noting Judge Jon O. Newman's observation in the context of post-trial consideration "for failure to turn over [*Brady/Giglio*] evidence is required if the evidence is 'material,' – that is . . . if there is a 'reasonable probability' to protect a verdict "may create a subtle pressure for even the most conscientious district judge to accept explanations of borderline plausibility to avoid the only relief then available, a new trial" (quoting *United States v. Biaggi*, 909 F.2d 662, 679 (2d Cir. 1990)).)  But the reality is that the legal standards that apply to post-trial *Giglio* motions reinforce this so-called "institutional pressure" to preserve a conviction after trial.  *See Ferguson*, 246 F.3d at 134 (reiterating that district courts must use their discretion to grant a new trial under Rule 33 "'sparingly' and in 'the most extraordinary circumstances'" (quoting *Sanchez,* 969 F.2d at 1414)); *Kirk Tang Yuk*, 885 F.3d at 86 (explaining that reversal of a jury conviction "for failure to turn over [*Brady/Giglio*] evidence is required if the evidence is 'material,' – that is . . . if there is a 'reasonable probability' that disclosure would have changed the outcome of the case or where the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict'" (citations omitted)); *Wong*, 78 F.3d at 79 (finding that *Giglio* information is "material" only "if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have

**CONCLUSION**

For the foregoing reasons, Defendant's motion for acquittal, or in the alternative, a new trial, is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 9, 2024
          Brooklyn, New York

---

undermined a critical element of the prosecution's case" (citations omitted)); *Bin Laden*, 397 F. Supp. 2d at 514 (noting that impeachment information is "only rarely" material).  Notwithstanding this "institutional pressure," here the Court does not feel any "pressure . . . to accept explanations of borderline plausibility to avoid the only relief . . . available, a new trial."  *Biaggi*, 909 F.2d at 679.